IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CASSANDRA RUSSELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:05-CV-0030-P |
| | § | |
| GRACE PRESBYTERIAN VILLAGE, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is Plaintiff's Motion for Summary Judgment, filed September 30, 2005, as well as Defendant's Motion for Summary Judgment, filed October 18, 2005. For the reasons stated below, the Court hereby DENIES Plaintiff's Motion for Summary Judgment[1] and GRANTS Defendant's Motion for Summary Judgment.[2]

**I. Background**

Plaintiff Cassandra Russell (hereinafter "Russell") was hired by the Grace Presbyterian Village (hereinafter "the Village") as a Certified Nurse Assistant on or about August 20, 2003. As a Certified Nurse Assistant, she was responsible for providing personal care services to nursing

---

[1] Plaintiff's Motion for Summary Judgment appears to be based on an allegation that she was shown letters without signatures at her deposition. Even if true, this does not entitle her to summary judgment. As such, her motion is summarily denied.

[2] On July 6, 2005, the Court entered a summary judgment briefing schedule, establishing an expedited deadline for summary judgment briefs in this case. The Court did so in an effort to save the parties time and money by avoiding a lengthy discovery process before summary judgment briefing. Here, defense counsel chose to invoke a variety of discovery procedures in preparing its motion for summary judgment. In fact, defense counsel requested and received an extension of the summary judgment briefing deadline so that it could take the pro se plaintiff's deposition. The Court notes that all of the evidence upon which it based its decision could have been presented much more efficiently and cost effectively by relying upon evidence Defendant had before discovery as well as sworn declarations from its key witnesses.

facility residents, providing basic upkeep of the facility, and otherwise assisting the supervising nurse as directed.

Until July 2004, Russell was normally assigned to the Two Anderson Nursing Unit, which provides care for Alzheimer's patients. While assigned to this unit, she was often scheduled to work the night shift with Charge Nurse Napoleon Washington (hereinafter "Washington"). Russell claims that, during their work together, Washington made unwelcome sexual advances on eight separate occasions and engaged in sexual activity, in Russell's presence, with another Certified Nurse Assistant, Sharhonda Bizzle (hereinafter "Bizzle").[3]

The record is not clear as to exactly when the alleged unwelcome advances began. At her deposition, Russell claimed that the incidents started before June 1, 2004. (App. at 14: Russell Dep. 54:2–4.) However, her EEOC charge states that the harassment by Washington began on June 1st. (App. at 74.) The incidents involving Bizzle apparently began in February 2004. (App. at 13: Russell Dep. 45:20–25.)

At her deposition, Russell testified about an unwelcome advance that Washington made towards her on June 10, 2004, when he allegedly touched her breast, compared her with Bizzle, and offered her money not to report it or say anything. (*Id.* at 13: 45:6–16.) She also testified that other

---

[3] Instead of offering its own sworn affidavits, Defendant attempts to establish a number of disputed facts based upon deemed admissions arising out of Russell's failure to answer requests for admission. However, in this case, the Court does not think that conclusively holding these facts as established against the pro se plaintiff furthers the interest of justice. *See, e.g.*, *United States v. Turk*, 139 F.R.D. 615, 618 (D. Md. 1991). The Court is particularly concerned that Defendant did not file a motion to compel before filing the instant motion for summary judgment. Also, Plaintiff did make multiple, albeit untimely, attempts to respond. (Pl.'s Mot. Summ. J. at 1; Pl.'s Request Admissions at 1.) These attempts clearly indicate that she was struggling to understand and comply with the Rule 36 procedures. As such, the Court thinks that it is overly harsh to deem these disputed facts as admitted against her. Discovery procedures should not be used as a snare for the unwary pro se plaintiff. *Turk*, 139 F.R.D. at 618.

incidents involved similar touching, payment offers, and verbal comparison to Bizzle's body. (*Id.* at 16–17: 53:12–54:1.) A second unwelcome advance is described in a letter Russell allegedly sent to Ms. Taylor and the Village Management Team on June 23rd:

> On June 23, 2004 Napoleon made another sexual advance towards me, Napoleon did not take the matter seriously, but continue to touch me on my behind. I am tired of him touching me. I felt violated; I did not wish to be around him never again Latashia saw him touching me I got mad this is happening too many times, and causing me to break down and cry please address this please.

(Compl. at 30.) Russell claims that she reported Washington's conduct before this letter, but offers no documentation in support of this claim. (App. at 17: Russell Dep. 54:5–14.)

Russell did email a second sexual harassment complaint to the Village between June 29th and July 2nd. (App. at 70–71.) In this email, Russell stated that she was being harassed on several occasions through constant exposure to Washington and Bizzle. (*Id.* at 70.) She described witnessing on the job sexual contact between the two, including "grabbing body parts (private areas), in the resident sitting area, mainly the coach [sic], and using sheets around them." (*Id.*) She also reported another incident where she found the two in the restroom at the same time and Washington had his pants down. (*Id.*) The email further complains of favoritism in the workplace and requests that management resolve the situation. (*Id.* at 70–71.)

Following this email, Russell had a meeting with Patty Weimer (hereinafter "Weimer") and Sabrina (last name not known) (hereinafter "Sabrina"). (App. at 20–21: Russell Dep. 60:7–61:11.) At this meeting, she was told that her complaint would be investigated and that the matter would be confidential. (*Id.* at 20–21: 60:23–61:8.)

After this meeting, members of management made at least one surprise inspection of the facility. (*Id.* at 22–24: 64:4–65:11, 66:7–11.) Management also had an additional security camera installed in front of the nurses' station. (*Id.* at 23: 65:12–66:1, 66:12–21.)

Russell testified that following her complaint Washington threatened to write her up as retaliation for reporting him. (*Id.* at 25–27: 84:17–86:25.) In a July 10th letter, she claimed that she had been confronted by Washington about approaching management. (*Id.* at 26.) She also claimed that the fact that Washington knew about the investigation brought on additional harassment and stress on the floor. (*Id.*) She sent an additional letter to management on or around July 13th or July 14th. (App. at 72; Compl. at 32.) In this letter, she stated that Washington continued to flirt with Bizzle, that he had lashed out in anger against her, and that she was still being subject to harassment, favoritism, intimidation, and stress in the workplace. (*Id.*)

On July 15th, Russell requested that she be reassigned to a different floor. (App. at 28, 35: Russell Dep. 92:6–16, 118:8–12.) Four days later, however, she was once again assigned to work with Washington at Two Anderson. (*Id.* at 28–31: 95:7.) When she arrived at work, Washington refused to work with her. (*Id.* at 29: 93:5–15.) She was then reassigned to another floor away from him. (*Id.* at 29: 93:16–17.) Around this time, Washington allegedly made another sexual advance by brushing up against Russell's buttocks. (*Id.* at 32: 101:11–13.)

Russell sent a letter to the Village on July 20th, expressing her frustration with the investigation. (Compl. at 37.) On July 21st, Russell sent a letter to the company's CEO,

complaining that Weimer and Sabrina's lack of confidentiality regarding her complaint had resulted in increased verbal harassment and discrimination. (*Id.* at 14.) That same day, she filed a Charge of Discrimination based on sex and retaliation with the EEOC. The next day, she sought medical treatment for stress and anxiety, and her doctor issued a note stating that she was temporarily disabled and unable to work for six months. (*Id.* at 5–7; App. at 76.)

On July 30th, Russell alleges that she met with Nicole Gann (hereinafter "Gann") from HR and was informed of her termination. (Compl. at 28.) At her deposition, she testified that Gann told her she was fired because of her EEOC complaint:

> Q. So she – Nicole Gann told you that the reason you were being fired –
> A. Because the EEOC case.
> Q. – was because you filed an EEOC charge?
> A. That's correct. . . .

(App. at 45: Russell Dep. 179:18–22.) Weimer sent her a letter on August 4th, stating that her request for a leave of absence was denied and that the Village was proceeding with separation papers. (App. at 78.) That same day, Russell filed a second Charge of Discrimination based on retaliation with the EEOC. (*Id.* at 80.) On August 24th, Gann sent Russell a letter stating that the Village had completed its investigation of her sexual harassment and retaliation complaint and found no sufficient evidence of such conduct. (*Id.* at 79.)

The EEOC issued its Dismissal and Notice of Rights on October 5, 2004. Russell,

proceeding pro se,[4] filed her complaint in this Court on January 5, 2005. She filed a Motion for Appointment of Counsel that same day, which was denied without prejudice on January 14, 2005. Defense counsel deposed Plaintiff on September 14, 2005. Plaintiff moved for summary judgment on September 30th, and Defendant filed a cross-motion for summary judgment on October 18th.

## II. Legal Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such an absence. *Celotex*, 477 U.S. at 323. However, all evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). In addition, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). At this point,

---

[4] Pleadings and briefs submitted by a pro se plaintiff are to be construed more permissively than those drafted by lawyers. *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 75 (5th Cir. 1993).

the nonmovant must provide specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 248–50; *Abbott v. Equity Group*, 2 F.3d 613, 619 (5th Cir. 1993). In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to his case and on which he bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23; *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1122 (5th Cir. 1988). Finally, the Court has no duty to search the record for triable issues. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

**III. Analysis**

    **A. Hostile Environment Claim**

Under Title VII of the Civil Rights Act of 1964, "it shall be an unlawful employment practice . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). In *Burlington Industries, Inc., v. Ellerth*, 524 U.S. 742 (1998), and its companion case, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court laid out

a "road map" for trial and appellate courts to follow in determining whether an employer is liable for such discrimination.[5] *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000). "At the first stop on the *Ellerth/Faragher* road map, courts are required to determine whether the complaining employee has or has not suffered a 'tangible employment action.'" *Id.* "If he has, his suit is classified as a 'quid pro quo' case; if he has not, his suit is classified as a 'hostile environment' case." *Id.*

### 1. No Tangible Employment Action

Here, Russell neither alleges nor provides summary judgment evidence that she suffered a "tangible employment action" at the hands of her supervisor. The Supreme Court has defined a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a significant change in benefits." *Ellerth*, 524 U.S. at 761. Russell offers evidence that she suffered stress and intimidation due to Washington's behavior and that she was forced to bear with workplace inequalities because he played favorites by letting his paramours sleep on the job and neglect their job responsibilities. (Compl. at 21, 26.) She does not, however, set forth evidence that he participated in her termination or that she suffered any other "tangible employment action" at his hands. *See, e.g.*, *Moayedi v. Compaq Computer Corp.*, 98 Fed. Appx. 335, 338 (5th Cir. 2004) (determining that "quid pro quo" theory was inapplicable where there was no fact issue as to whether the alleged harasser participated in the decision to terminate the employee). As such, her cause of action based on Washington's behavior is appropriately analyzed as a "hostile

---

[5] In *Casiano*, the Fifth Circuit panel included a helpful graphic representation of the "road map" as an appendix to its opinion. 213 F.3d at 288.

environment" claim.

## 2. Severe or Pervasive Sexual Harassment

Once it has been determined that the plaintiff suffered no "tangible employment action" at the hands of her supervisor and is therefore asserting a "hostile environment" claim, the next inquiry is whether, if proved, the actions of the supervisor constitute "severe or pervasive sexual harassment." *Casiano*, 213 F.3d at 284; *see also Meritor*, 477 U.S. at 67 ("[F]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"). If the actions do not constitute severe or pervasive sexual harassment, "Title VII imposes no vicarious liability on the employer; but if they do, the employer is vicariously liable — unless the employer can prove both prongs of the *Ellerth/Faragher* affirmative defense . . . ." *Id.*

"Not all harassment will affect a term, condition, or privilege of employment." *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999). For example, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not "affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Meritor*, 477 U.S. at 67. Nor does "simple teasing, offhand comments, and isolated incidents (unless extremely serious)." *Faragher*, 524 U.S. at 788. Rather, "[f]or harassment to affect a term, condition, or privilege of employment, it must be both objectively and subjectively abusive." *Hockman v. Westward Communs., LLC*, 407 F.3d 317, 325 (5th Cir. 2004). In order to determine whether an environment is sufficiently hostile or abusive, courts "look[] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787–88 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)). "The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." *Harris*, 510 U.S. at 23.

In the instant case, the Court finds that Russell has presented sufficient evidence to raise a fact question as to whether Washington's conduct subjected her to a hostile work environment. There is strong evidence suggesting that she personally found the environment abusive. In addition to her own deposition testimony on the issue, the medical records submitted along with her complaint suggest that her working environment caused her sufficient psychological harm to warrant medical attention and the prescription of anti-anxiety medication. (Compl. at 5–8, 11.) Furthermore, the physician who treated her on July 22, 2004, issued a note stating that she was "temporarily disabled for at least 6 months" and unable to work. (Def.'s App. at 76.)

Russell has also presented sufficient evidence to create a fact issue as to whether a reasonable person would find the environment abusive. First, in regards to the frequency of the conduct, Russell testified that Washington made eight unwelcome advances towards her and that she was forced to witness Washington and Bizzle provocatively touching each other "a lot of times" during their work together on the night shift. (Def.'s App. at 16–17, 49: Russell Dep. 53:12–54:1, 205: 14–24.) While the record is not clear as to the precise timing and duration of the aforementioned incidents, the first EEOC charge states that the plaintiff was subject to the hostile environment starting in February 2004. (Def.'s App. at 74.) Second, the alleged conduct, if taken

as true, certainly qualifies as severe. Russell claims that Washington's unwelcome approaches involved illicit touching of her breast and buttocks, offers of payment not to report the conduct, and statements comparing the shape of Russell's body to that of Bizzle. (Def.'s App. at 13, 16–17: Russell Dep. 45:6–16, 53:12–54:1.) Furthermore, Washington and Bizzle allegedly engaged in overtly sexual contact in front of Russell in an effort to entice her. (Def.'s App. at 32: Russell Dep. 101:14–17.) Third, while Russell does not claim that she was physically threatened by Washington, a reasonable juror could most definitely find that the conduct was humiliating. Finally, a reasonable fact finder could conclude that the alleged conduct interfered with Russell's ability to do her job. In short, the summary judgment evidence indicates that a genuine issue of fact exists as to whether Washington's conduct subjected Russell to a sexually hostile work environment.

### 3. Availability of the *Ellerth/Faragher* Affirmative Defense

The Court's determination that there is a fact question as to the existence of a sexually hostile work environment does not, however, end the inquiry. As noted above, an employer can avoid vicarious liability on a hostile work environment claim by proving the following two elements of the *Ellerth/Faragher* affirmative defense:[6] "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

In regards to the availability of this defense, the Court finds that the Village has presented

---

[6] As the Fifth Circuit noted in *Casiano*, "this is the employer's only affirmative defense in a supervisor sexual harassment case post *Ellerth/Faragher*, and it is available only in a hostile environment (no tangible employment action) situation; never in a quid pro quo (tangible employment action) case." 213 F.3d at 284.

evidence that it exercised reasonable care in responding to the situation and that Russell failed to take advantage of the corrective opportunities provided, and Russell has failed to respond with evidence establishing a fact issue on this point.  After Russell submitted her complaint, the Village took prompt remedial action. Two management officials met with Russell, at least one surprise inspection was conducted, and an additional camera was installed on the floor in front of the nurses' station.  As Russell did not complain of further sexual advances or on the job sexual activity for several weeks, it was fair for the company to assume that its action was effective.  Russell did claim at her deposition that another unwanted approach occurred between July 19th and July 20th and that she notified the company of this in a July 20th letter.  However, before the Village could take further remedial action, she requested six months disability leave without entitlement to it.  By requesting such leave, she failed to take advantage of the Village's decision to reassign her to a different floor than Washington.

In sum, Russell has failed to establish a fact issue as to whether the Village took prompt remedial action after being notified of her claim and she took advantage of all the corrective opportunities provided.  As such, Defendant is entitled to summary judgment on the hostile environment claim.

### B.  Retaliation

Title VII also makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42

U.S.C.A. § 2000e-3(a) (2000). "To establish a prima facie case of retaliation, [the plaintiff] must show three elements: (1) that [she] engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 655 (5th Cir. 2004) (internal quotations omitted). Here, the parties agree that the first two elements are satisfied, but the Village argues that Russell cannot establish a causal link between the filing of her first EEOC complaint and her termination. The company further argues that, even if she can establish a causal link, it is still entitled to summary judgment because it would have made the same decision anyways based on her request for six months leave.

In regards to the causal link, the Court finds that the combination of Plaintiff's deposition testimony regarding her conversation with Gann and the close temporal proximity between the filing and the termination is sufficient to create a fact issue as to this element. At her deposition, Plaintiff testified that Gann told her that she was terminated because she filed an EEOC complaint. If believed, this testimony constitutes direct evidence of retaliation. In addition, the close proximity between Russell's first EEOC complaint, filed July 21, 2004, and her termination, which occurred one to two weeks later, constitutes further evidence of retaliation. *See, e.g.*, *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001). Based on this record, the Court concludes that there is a sufficient basis for a reasonable fact finder to conclude that there was a causal link between Russell's filing the EEOC complaint and her termination.

However, this does not end the inquiry. The Village further argues that, even if the EEOC complaint was a motivating factor in the termination decision, it is still entitled to summary

judgment because it has established the *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), mixed-motive affirmative defense as a matter of law. In particular, Defendant claims that it would have made the same decision anyways due to her request for six months disability leave without entitlement to it.

The Court agrees that Title VII retaliation claims are still governed by *Price Waterhouse* and not 42 U.S.C. § 2000e-2(m). In *Price Waterhouse*, "the Supreme Court held that all discrimination plaintiffs must prove that but for the discriminatory intent, the adverse employment decision would not have been made." *Rubinstein v. Administrators of the Tulane Educ. Fund*, 218 F.3d 392, 403 (5th Cir. 2000). In response to this decision, Congress amended Title VII to include 42 U.S.C. § 2000e-2(m), which "allows for limited remedies in cases where plaintiffs are able to prove that one motive for the adverse employment action is discrimination, even when the defendant is able to prove that the action would have been taken in the absence of the discriminatory motive." *Id.* However, the plain language of § 2000e-2(m) only refers to discrimination based on "race, color, religion, sex, or national origin" and does not mention retaliation. As a result, every circuit court that has examined the issue in detail has held that it does not apply to retaliation claims. *See Tanca v. Nordberg*, 98 F.3d 680, 684 (1st Cir. 1996); *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 935 (3d Cir. 1997); *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 552 n.7 (4th Cir. 1999); *McNutt v. Board of Trustees*, 141 F.3d 706, 709 (7th Cir. 1998); *Norbeck v. Basin Elec. Power Coop.*, 215 F.3d 848, 852 (8th Cir. 2000); *Lewis v. YMCA*, 208 F.3d 1303, 1305 (11th Cir. 2000). While the Fifth Circuit has not addressed the issue, the plain language of the statute is clear, and therefore the Court agrees with these decisions that § 2000e-

2(m) does not apply to Title VII retaliation claims. *See Rubinstein*, 218 F.3d at 403 (noting that the issue remains unresolved in the Fifth Circuit); *see also Levias v. Tex. Dep't of Crim. Justice*, 352 F. Supp. 2d 751, 772 (S.D. Tex. 2004) (finding that § 2000e-2(m) does not apply to Title VII retaliation claims). As such, if the Village can show that it would have made the same decision regardless of the EEOC complaint, it is entitled to a complete defense from liability under *Price Waterhouse*.

The Village has introduced evidence showing that it would have terminated Plaintiff regardless of her EEOC complaint due to her request for six months leave without entitlement to it. Weimer's letter dated August 4th denied her request for a leave of absence and stated that the Village was proceeding with separation papers as a result. (App. at 78.) The Village's decision also comports with the practical reality that most employers will not hold a job open for an employee for 6 months unless the employee qualifies for FMLA or another form of approved leave. Russell has failed to respond with evidence establishing a fact issue on this point. As such, summary judgment is appropriate on Russell's retaliation claim as well.

## Conclusion

For the reasons stated above, the Court hereby DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Motion for Summary Judgment.

**It is so ordered.**

Signed this 22nd day of March 2006.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE